**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

ANTHONY L. WALKER

VERSUS

UNIVERSITY OF LOUISIANA
MONROE, ET AL.

CIVIL ACTION NO. 24-1181

JUDGE ALEXANDER C. VAN HOOK

MAGISTRATE JUDGE MCCLUSKY

## MEMORANDUM RULING

Anthony L. Walker ("Walker") spent an almost twenty-year career working for the University of Louisiana Monroe's ("ULM") College of Pharmacy. Throughout his career, Walker served as an academic professor, moving through the ranks from instructor to professor. Walker also held an administrative position as the pharmaceutical lab manger ("Lab Manager") and received an annual stipend for his administrative duties. But Walker, who is African American, has alleged that ULM paid him a smaller stipend than what the white administrators received. Walker also claims that ULM retaliated against him for filing a discrimination complaint and taking statutorily protected leave, and otherwise, created a hostile work environment. For the following reasons, the Court grants summary judgment and dismisses Walker's claims.

### Background

In 2005, ULM hired Walker for both an academic and an administrative position. Walker's Dep. 20, Record Document 42-2. Academically, Walker originally held the title of instructor and taught three "lab sequences." *Id*. at 20, 58. In his

1

administrative role, Walker served as the Lab Manager. *Id.* at 20. Importantly, ULM structured the Lab Manager position as independent of Walker's academic one. The Lab Manager position required an annual contract extension and provided an administrative stipend of $2,500. *Id.* at 21.

As Lab Manager, Walker had primary responsibility for overseeing the school's "mock pharmacy" where students learned how to counsel patients, interact with doctors, compound medicines, and dispense medicines. Walker's Dep. 26-27. Walker handled purchasing, inventorying, and maintaining equipment used in the mock pharmacy. *Id.* at 27. Walker also ensured medications were secured when not being used or were returned after they had been dispensed. *Id.* at 24.

Since the beginning, one of Walker's duties as Lab Manager had been acting as the Pharmacist-in-Charge for the mock pharmacy. Walker's Dep. 18 ("All I know is I've done that work from the beginning until the end that I was there."). According to Walker, the Pharmacist-in-Charge is a regulatory requirement of the Louisiana Board of Pharmacy. *Id.* at 22. To purchase and dispense medication, a pharmacy must designate a registered pharmacist to act as the Pharmacist-in-Charge. *Id.* And because the mock pharmacy, which Walker managed, purchased and dispensed medication, Walker was designated as the Pharmacist-in-Charge. *See id.* at 17.

Around two years after he started, Walker pushed to have his job description changed. Walker's Dep. 17. Walker said that "nobody" acknowledged that he had been designated as the Pharmacist-in-Charge, and he advocated to have that duty listed in the Lab Manager's job description. *Id.* at 17, 161 ("I asked that they add pharmacist

2

in charge to it."). Sometime later, Walker's supervisors acquiesced and updated the job description to specifically identify the Pharmacist-in-Charge role as a duty of the Lab Manager. *See id.* at 161. Under the revised job description, the Lab Manager performed "5%" administrative work, including serving "as Pharmacist-in-Charge of the mock pharmacy." Record Document 34-9, at 1. Walker's administrative stipend did not change when his job description was updated. *Id.* at 16, 169.

Over a decade later, on October 1, 2017, Glenn Anderson, the Dean of Pharmacy, announced a faculty retention plan. Walker's Dep. 97, 109. Under the plan, Anderson created five program director positions that received an annual administrative stipend of $15,000. *Id.* at 148. The administrative duties of each position varied, but all included a significant time commitment to administrative tasks, ranging from 90% to 25% of their workload. *See* Record Documents 34-10 – 34-14. Notably, Walker's direct supervisor, Connie Smith, was selected as the Program Director of Experiential Education, and her workload consisted of 90% administrative duties. Record Document 34-11; Walker's Dep. 79, 162. Although Walker alleged that Anderson discriminated against him by selecting five white employees for the program director positions, Walker did not file an EEOC charge of discrimination. Walker's Dep. 18, 153.

Less than a year later, a College of Pharmacy committee rejected Walker's application for promotion from assistant professor to associate professor. Walker's Dep. 43. After the rejection, on September 18, 2018, Walker filed a discrimination complaint with ULM's human resources department. *Id.* at 45. In his complaint,

3

Walker alleged that he had been better qualified than two white candidates who had received a promotion. *Id.* ULM performed an investigation and determined that the committee had applied the wrong guidelines to Walker's application. The same committee then reconsidered Walker's application and granted his promotion. *See id.* at 45-46; Record Document 34-6, at 1.

Several years later, in 2022, Walker filed a pay grievance asserting that ULM should increase his administrative stipend to match the $15,000 stipend of the program directors. *Id.* at 74-75. Following an investigation, ULM found that Walker was not entitled to a higher stipend because he held a lower rank within the organizational structure, and in effect, sought the same stipend that his supervisor had received. *See id.* at 84-85, 96.

Not long after ULM rejected his demand, Walker requested extended leave under the Family Medical Leave Act ("FMLA").  According to Walker, the grievance process had caused him anxiety, and he needed time to care for his mental health. Walker's Dep. 114, 194. ULM approved his FMLA leave request. *Id.* at 137. Then, around the same time, Walker informed Anderson that he would no longer serve as the Pharmacist-in-Charge, and Walker also notified the Board of Pharmacy that he had withdrawn from the role. *Id.* at 69; Record Document 34-7 at 1.

When Walker withdrew as the Pharmacist-in-Charge, Anderson did not reappoint him as the Laboratory Manager. Anderson's Decl. 2, Record Document 34-17. In his declaration, Anderson explained the Pharmacist-in-Charge role is a "required duty of any person seeking to serve as Lab Manager." *Id.* at 1. Moreover,

according to Anderson, Walker "no longer met the requirements of the Lab Manager position" because he "resigned his Pharmacist-in-Charge" role and thereby "refused to undertake the full responsibilities, duties, and requirements of the Lab Manager position[.]" *Id.* at 2. Given the timing of Walker's withdrawal as the Pharmacist-in-Charge, Walker had still been on FMLA leave when Anderson decided not to renew his contract. Walker's Dep. 137.

Ultimately, about a year after his demotion, Walker retired from ULM and filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Walker's Dep. 36, 61-62; Record Document 34-3. He filed the EEOC charge on May 24, 2024 and alleged that ULM discriminated against him when it demoted him from Lab Manager. Record Document 34-3. After the EEOC issued its determination and notice of rights, Walker filed this lawsuit against ULM, Anderson, and others. Record Document 1. Previously, this Court dismissed with prejudice Walker's claims arising under the Americans with Disability Act. Record Document 48. And now, ULM has filed a motion for summary judgment on Walker's remaining claims. Record Document 34.

## Standard

Federal Rule of Civil Procedure 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When the burden at trial will rest on the nonmovant, the movant need not produce evidence to negate the elements of the nonmovant's case; rather, it need only point out the absence of

5

supporting evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant satisfies its initial burden, the nonmovant must demonstrate a genuine dispute exists by "going beyond the pleadings" and "designating specific facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). This burden requires more than metaphysical doubt, conclusory or unsubstantiated allegations, or a mere scintilla of evidence. *Id.*

## Analysis

Walker's remaining causes of action arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), Louisiana Employment Discrimination Law, La. Rev. Stat. § 23:301 ("LEDL"), and the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 ("FMLA"). Walker has alleged race-based violations of Title VII through discrimination, retaliation, and harassment. *See* Record Document 1 at 5. Because LEDL "is substantively similar to Title VII," the Court considers these claims together and reaches the same outcome on the LEDL claims as it does the Title VII claims. *Vidrine v. Guillot*, No. 21-30203, 2022 WL 3544396, at *2 (5th Cir. Aug. 18, 2022) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 556 n.4 (5th Cir. 2007)). In addition, Walker has asserted a retaliation claim under the FMLA. *See* Record Document 1, at 7; Record Document 42 at 9.

## I. Title VII Discrimination

Title VII makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race[.]" *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 502 (5th Cir. 2023)

(abrogating requirement that an employee show "an ultimate employment decision[.]"). A burden shifting framework applies to Title VII discrimination claims, and the employee must first establish a prima facie case of discrimination. *Lee v. Kan. City R.R. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). If he does, the burden shifts to the employer "who must offer an alternative non-discriminatory explanation for the adverse employment action." *Id.* Once an employer has offered a non-discriminatory explanation, "the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for racial bias." *Id.*

Although unclear, Walker seemingly articulated two theories of racial discrimination. First, Walker stated a "failure to promote" claim, alleging ULM should have named him a program director alongside the five white employees who were promoted on October 1, 2017. *See* Record Document 1 at 5. Second, Walker pleaded a "wage discrimination" claim, arguing that he should have received a stipend equal to the allegedly "similarly situated" program directors. *See id.*

## A.    Failure to Promote

Before considering the merits of Walker's failure to promote claim, the Court must determine whether it is time barred. The United States Court of Appeals for the Fifth Circuit "has long required plaintiffs to exhaust their administrative remedies before bringing suit under Title VII." *Price v. Choctaw Glove & Safety Co.*, 459 F.3d 595, 598 (5th Cir. 2006). In Louisiana, a plaintiff must file a charge of discrimination within 300 days of the allegedly discriminatory act. *Hartz v. Adm'r of Tulane Educ. Fund*, 275 F. App'x 281, 287 (5th Cir. 2008). Failing to do so means that "the employee

7

may not challenge the alleged discrimination in court." *See, e.g., id.* at 287 (barring a college professor's failure to promote claim because he did not timely file a charge of discrimination).

In this case, Anderson announced the faculty retention plan that created the program director positions on October 1, 2017. Walker's Dep. 109, 147-48. Walker learned at the time of announcement that he had not been chosen as a program director. *Id.* at 150. Had Walker filed a charge of discrimination with the EEOC within thirty days of that announcement then his claim would have been timely. Instead, Walker waited more than six years, filing his EEOC charge on May 24, 2024. Record Document 34-3, at 1. Therefore, Walker's failure to promote claim is time barred under Title VII.

**B.    Wage Discrimination**

Walker also alleged that ULM paid him less of an administrative stipend than what the allegedly "similarly situated" white program directors received. Record Document 1 at 5. To survive summary judgment, Walker must first establish a prima facie case of discrimination and prove that (1) he is a member of a protected class, and (2) he is paid less than a non-member for work requiring substantially the same responsibility. *Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir. 1984). Walker, who is African American, satisfies the first element, so the central issue is whether ULM paid him less than white employees who had substantially the same responsibility. *See Lyles v. Tex. Alcohol Beverage Com'n*, 379 F. App'x 380, 383 (5th

Cir. 2010) (recognizing an African American plaintiff as "a member of a protected class.").

In determining whether Walker had substantially the same responsibility as his comparators, the Court considers whether the employees were similarly situated. *See Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 641, 651 (5th Cir. 2025). Although the employees need not have "identical" circumstances, the circumstances must still be "nearly identical." *Id.* Nearly identical circumstances exist where the employees "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person[.]" *Id.*

Here, the Court finds that Walker has failed to prove that he is similarly situated to the five white program directors who received a higher administrative stipend. To start, the Court is not persuaded by Walker's attempt at manufacturing "nearly identical" circumstances, because he described his position and those of the comparators at an exceedingly general level. *See, e.g.*, Record Document 42 at 16-17. According to Walker, he is nearly identical to the comparators because they were: registered pharmacists, professors in the same department, worked under the same decision maker, and performed administrative duties. *Id.* Walker's generalized claim of nearly identical circumstances fails for several reasons.

First, that Walker and his comparators are all pharmacists and professors is immaterial for the stipend at issue. As Walker explained throughout his deposition, he received a regular salary as a professor but the complained of stipend resulted from his administrative role as the Lab Manager. Walker's Dep. 57, 72. Walker does

9

not argue that ULM paid him a discriminatory salary as a professor, only that his administrative stipend was less than his comparators. *See* Walker's Dep. 199. Accordingly, the administrative duties of Walker and the comparators, not their professorial roles, matter for determining whether they were similarly situated.

Second, Walker's conclusory statement that the comparators all "performed administrative duties" does not reflect that his role had significantly less administrative responsibility than the better paid program directors. Walker received his stipend because he held the title of "Manager, Pharmaceutical Care Lab," Record Document 34-9 at 1; Walker's Dep. 71-72. Based on his job description, which Walker helped create, only 5% of his work involved administrative duties. Record Document 34-9, at 2; Walker's Dep. 18.

Meanwhile, the administrative work of the program directors involved far more of their time. The workload of the Program Director of Experiential Education consisted of 90% administrative duties, including overseeing the daily operations of the office. Record Document 34-11 at 1,3. Similarly, the Program Director of Student Success devoted 80% of his time to administrative work like supporting the university's admissions committee. Record Document 34-12 at 1-2. Even the two program director positions with the lightest administrative workloads devoted one-quarter of their time to administrative tasks, far exceeding Walker's 5% percent. Record Document 34-10 at 1 ("The Director of Faculty Development will be a 25% position."); "Record Document 34-14 at 1 ("The Information Services Director is a 25% position."). Moreover, as for the tasks themselves, Walker admitted that each

10

program director had individualized duties, and he did not know their specific functions. *See* Walker's Dep. 79-80.

Third, Walker mischaracterizes the evidence in claiming that he and the comparators "worked under the same decision maker." Record Document 42 at 17. To the contrary, Walker did not share a direct supervisor with the other program directors, and he held a lower administrative rank than them. As the Lab Manager, Walker reported to the Program Director of Experiential Education, Connie Smith. Record Document 34-9 at 1; Walker's Dep. 96. Walker even acknowledged in his deposition that the higher stipend he desired "would equate to that of [his] supervisor" who was a program director. Walker's Dep. 96. Near his retirement, Walker "appealed" to have a different supervisor because Smith did not "advocate" for him. *See* Walker's Dep. 59. Consequently, Walker's supervisor became Jessica Brady, an associate clinical director. Walker's Dep. 133-34.

Even after his supervisor changed to an associate clinical director, Walker still did not share a supervisor with or the rank of the program directors. Walker himself explained the leadership structure: dean of pharmacy, associate dean, clinical director, associate clinical director, and then program director. *See* Walker's Dep. 135. While Walker reported to the associate clinical director, the program directors reported to someone two tiers higher. *Id.* Each of the program directors reported to the associate dean of academic affairs, not the lower ranked associate clinical director. *See, e.g.*, Record Document 34-11 at 1 (stating that the Program Director of Experiential Education "reports to Associate Dean, Academic Affairs.").

11

In short, Walker has not shown a genuine dispute of material fact that he is similarly situated to the white program directors. Walker performed less administrative work than the program directors, held a lower rank within the organizational structure, did not share a direct supervisor, and otherwise, Walker offered no evidence that he and the comparators performed the same administrative tasks. *See, e.g.*, *Ortiz v. Shaw Group, Inc.*, 250 F. App'x 603, 606-07 (5th Cir. 2007) (holding employees were not similarly situated where one worked in a senior management position whereas the plaintiff worked in a lower ranking managing position). Therefore, Walker's claim of wage discrimination fails.

## II.    Title VII Retaliation

An employer cannot discriminate against an employee for engaging in conduct protected by Title VII. *Thomas v. Tex. Dep't Crim. Just.*, 220 F.3d 389, 394 (5th Cir. 2000). The familiar burden shifting analysis of *McDonnell Douglas* applies to Title VII retaliation claims. *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996). Under the *McDonnell Douglas* framework, the employee must first establish a prima facie case of retaliation. *Id.* If the employee does so, the burden shifts to the employer who must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* at 305. Then, the ultimate burden shifts back to the employee who "bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason." *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 492 (5th Cir. 2011).

A prima facie case of retaliation requires that Walker establish three elements: (1) he participated in a Title VII protected activity, (2) he suffered an adverse

employment action by his employer, and (3) there is a causal connection between the protected activity and the adverse action. *Stewart v. Miss. Transp. Com'n*, 586 F.3d 321, 331 (5th Cir. 2009). If Walker cannot satisfy all three elements, summary judgment is appropriate. *Id.*

In this case, Walker has satisfied the first element of his prima facie case. The Fifth Circuit has held: "[a]n employee that files an internal complaint of discrimination engages in a protected activity." *Rodriguez v. Wal-Mart Stores, Inc.* 540 F. App'x 322, 328 (5th Cir. 2013). ULM does not dispute that Walker engaged in a protected activity when he filed an internal discrimination complaint with the human resources department on September 20, 2018. Record Document 34-1 at 24; Record Document 34-5 at 1. Accordingly, Walker has satisfied the first element of a prima facie discrimination claim.

Second, Walker must show that he suffered an adverse employment action. Walker claims that he experienced an adverse action when Glenn Anderson, the Dean of Pharmacy, removed his administrative stipend on three occasions: October 2017, June 2019, and August 2023. Record Document 1, at 4. ULM argues that two of these actions are barred, because he did not file an EEOC charge within 300 days of the act. Record Document 34-1 at 24. Meanwhile, Walker claims that all three actions "fall under the continuing violation doctrine" and none should be barred. Record Document 42 at 17.

The continuing violation doctrine holds that "where the last act alleged is part of an ongoing pattern of discrimination and occurs within the filing period, allegations

concerning earlier acts are not time-barred." *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 865 (5th Cir. 1993). However, "discrete actions, even if serial, are not entitled to the shelter of the continuing violation doctrine." *Doe v. United States*, 853 F.3d 792, 802 (5th Cir. 2017) (internal quotations omitted). At least one other court has recognized that a reduction in pay is a "discrete act" and not a continuing violation. *See, e.g.*, *Webb v. HMSHost, Inc.*, No. 24-3111, 2026 WL 886626, at *8 (N.D. Tex. Mar. 31, 2026).

Here, the Court finds that Walker has alleged a series of discrete acts, not one continuing violation. Anderson's decisions to remove Walker's stipend on three different occasions constitute three independent acts, and thus, three separate adverse employment actions. Although each removal had a continuing effect in reducing Walker's compensation with every paycheck, the continuing violation doctrine applies to ongoing acts not ongoing effects. *See Del. State Co. v. Ricks*, 449 U.S. 250, 258 (1980) (noting that continuing violation theory did not apply because denial of tenure was discrete act despite having an ongoing effect); *see also McGregor v. La. State Bd. of Supervisors*, 3 F.3d 850, 867 (5th Cir. 1993) ("[T]he continuing violation theory [cannot] resurrect claims about discrimination concluded in the past, even though its effects persist.") (internal quotations and alternations omitted); *see, e.g.*, *Baldwin v. Extended Stay Am. Co.*, No. 16-604, 2016 WL 4386098, at *4 (W.D. Tex. Aug. 17, 2016) ("[T]he continuing violations doctrine does not apply to ongoing effects.")

Having decided that the continuing violation theory does not apply, the Court must determine which adverse employment actions Walker can use to establish a prima facie case of retaliation. As explained already, actions that did not occur within 300 days of the filing of an EEOC charge of discrimination are time barred. *Hartz*, 275 F. App'x at 287. Walker filed his EEOC charge on May 24, 2024, so the removal of his stipend on August 29, 2023 is the only adverse employment action that occurred within 300 days of that date.  Record Document 34-2 at 1; *see also* Record Document 1 at 4. Moreover, ULM has conceded that the removal of Walker's stipend constitutes an adverse employment action for purposes of Title VII. Record Document 34-1 at 24. Therefore, Walker's prima facie case of retaliation depends entirely on the removal of his stipend on August 29, 2023.

Third, Walker must establish a causal connection exists between his internal discrimination complaint on September 20, 2018 and the removal of his administrative stipend on August 29, 2023. The Court finds that he has not done so. Almost five years elapsed between the date of Walker's internal complaint and the removal of his stipend, and considering similar gaps in time, the Fifth Circuit has held them "far too long" to establish a causal connection "without other evidence of causation." *Heath v. Bd. of Supervisors for S. Univ. and Agric. And Mech. Co.*, 850 F.3d 731, 741-42 (5th Cir. 2017) (rejecting that the continuing violation theory applied to older adverse actions and holding that a "three-year period is not the very close in time connection we require to establish causation by timing alone."). Because

15

Walker has offered no other evidence of a causal connection aside from a lengthy time gap, his prima facie case of retaliation fails.

### III.   Title VII Harassment

Title VII guarantees employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). As such, an employee "may establish a violation of Title VII by proving that discrimination based on [race] has created a hostile or abusive work environment." *Id.* To establish a hostile work environment claim, an employee must prove he:

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). In this case, Walker alleged that he endured harassment through unequal treatment when Anderson removed his administrative stipend thrice, demoted him from Lab Manager, and refused to raise his administrative stipend. Record Document 42 at 13. Even assuming this disparate treatment is a cognizable hostile work environment claim, which is doubtful, Walker's claim fails because it did not affect a term, condition, or privilege of his employment.

Harassment only affects a term, condition, or privilege of employment when its "either severe or pervasive." *Hernandez*, 670 F.3d at 651. In evaluating severity,

16

courts "look to the totality of the circumstances" and consider factor like "the frequency of the discriminatory conduct…whether its physically threatening or humiliating, or a mere offensive utterance[, and] whether it unreasonably interferes with an employee's work performance." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009).

In this case, the alleged conduct of Anderson "is not sufficiently harassing to make out a hostile work environment claim." *See, e.g.*, *Smith v. Miss. Dep't of Child Protective Serv.*, No. 18-4418802, 2019 WL 4418802, at *3 (N.D. Miss. Sept. 16, 2019) (rejecting claim about unequal treatment in work assignments). Harassing conduct requires "discriminatory verbal intimidation, ridicule, and insults[.]" *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000). Walker has offered no evidence of hostile or abusive behavior from Anderson or others. *See, e.g.*, *Akanno v. Med. City McKinney*, No. 23-1054, 2024 WL 4272936, at *6 (E.D. Tex. Aug. 28, 2024) (rejecting hostile environment claim where "[p]laintiff does not identify any other instance of intimidation, ridicule, or insult."). Moreover, Anderson's alleged conduct occurred only a few times across several years, and such isolated incidents are not enough to sustain a hostile work environment claim. *West v. City of Houston, Tex.*, 960 F.3d 736, 742 (5th Cir. 2020) (holding plaintiff cannot show pervasive harassment where "the complained of actions were isolated or infrequent[.]"). Accordingly, Walker's Title VII harassment claim does not survive summary judgment.

## IV.   FMLA Retaliation

The FMLA "guarantees eligible employees 12 weeks of leave in a 1-year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter." *Ragsdale v. Wolverine Worldwide, Inc.*, 535 U.S. 81, 86 (2002). Furthermore, the FMLA "protects employees from retaliation or discrimination for exercising their rights under the FMLA." *Mauder v. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 580 (5th Cir. 2006). In his complaint, Walker alleged that ULM and Anderson retaliated against him while on FMLA leave when it decided to not renew his Lab Manager appointment. Record Document 1 at 4, 7.

### A.   Sovereign Immunity

As a threshold, the Court finds that ULM[1] is entitled to sovereign immunity for Walker's FMLA claim. Federal courts do not have jurisdiction for "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Bryant v. Tex. Dep't of Aging and Disability Serv.*, 781 F.3d 764, 769 (5th Cir. 2015). Here, ULM is entitled to sovereign immunity, because Louisiana has not waived its sovereign immunity for FMLA claims and ULM is an "arm of the state" as a member of the University of Louisiana system. *See Allain v. Bd. of Supervisors of Univ. of La. Sys.*, No. 13-2754, 2015 WL 6554440, at *2 (W.D. La. Oct. 29, 2015) ("Per Fifth Circuit

---

[1]   The Court's finding of sovereign immunity applies equally to defendants named in their official capacity.

precedent, ULM is an 'arm' of the state and not subject to suit absent waiver or congressional abrogation.").

Nevertheless, Walker argues that Congress has abrogated immunity for "family care" claims under the FMLA. Record Document 42 at 28-29. Walker is correct that Congress has abrogated sovereign immunity for family care claims, but it has not done so for self-care claims. *Bryant*, 781 F.3d at 769 ("Congress has validly abrogated states' sovereign immunity with respect the FMLA's family-care provision. It has not done so with respect to the statute's self-care provision; thus, states may still assert an Eleventh Amendment immunity defense against claims based on that provision."). Here, Walker asserted a self-care claim, not a family care claim, under the FMLA, because he used the FMLA's extended leave to care for himself and his mental health. Walker's Dep. 194 (testifying that "I went on family medical leave in '23…because my mind wasn't in the right place."). Accordingly, ULM is entitled to sovereign immunity for Walker's FMLA claim.

### B.      Qualified Immunity

Walker asserted an FMLA retaliation claim against Anderson in his individual capacity, and in response, Anderson pleaded qualified immunity. *See* Record Document 1 at 4; Record Document 5 at 2. Qualified immunity is a legal doctrine "shield[ing] federal and state officials from money damages." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). As a threshold, the defendant must show that "he is a government official whose position involves the exercise of discretion[.]" *See Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997). Here, Anderson was a dean of ULM

handling employment decisions, and as such, he was an official working for an arm of the state whose position involved the exercise of discretion. *See, e.g.*, *Babinski v. Sosnowsky*, 79 F.4th 515 (5th Cir. 2023) (allowing university professor to raise qualified immunity). Therefore, Anderson may invoke the affirmative defense of qualified immunity.

Qualified immunity is a two-part inquiry. *Modica v. Taylor*, 465 F.3d 174, 179 (5th Cir. 2006) (applying qualified immunity to an FMLA claim). First, the district court determines whether the plaintiff's allegations establish a violation of a clearly established right. *Id.* Second, the district court must decide whether the official's conduct was objectively reasonable. *Id.* If an official's conduct was objectively reasonable, even if he had violated a clearly established right, he is entitled to qualified immunity. *Id.* The plaintiff has the burden "to demonstrate the inapplicability of the defense." *Babinski*, 79 F.4th at 520. In this case, Anderson has conceded that Walker alleged a violation of a clearly established right because he argued only that his conduct was objectively reasonable. Record Document 34-1 at 41-42; *see Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (noting that failure to raise an argument forfeits it).

The Court finds that Anderson's decision to not reappoint Walker as Lab Manager was objectively reasonable. As Anderson explained in his declaration, Walker "no longer met the requirements of the lab manager position" because he refused to fulfill the role of Pharmacist-in-Charge. Anderson's Decl. 2. Although Walker claims the role of Pharmacist-in-Charge had been independent of the Lab

20

Manager position, his own testimony belies that argument. Walker admitted that he had performed the role of Pharmacist-in-Charge since the "beginning" of his time as the Lab Manager. Walker's Dep. 18. Moreover, the role of Pharmacist-in-Charge had been specifically identified as a responsibility of the Lab Manager in its description. Record Document 34-9 at 2. Even more telling, Walker himself pushed himself to have the role of Pharmacist-in-Charge listed as a duty of the Lab Manager. Walker's Dep. 161. According, the Court holds that removing Walker from a position when he refused to complete a duty of that position is objectively reasonable.

Nevertheless, Walker claims that Anderson's reason for removing him as Lab Manager was pretext for retaliation. *See* Record Document 42 at 19-23. According to Walker, Anderson replaced him as Pharmacist-in-Charge with Jessica Brady ("Brady") who did not hold the position of Lab Manager. *Id.* at 20. Walker argues that installing someone other than the Lab Manager as the Pharmacist-in-Charge constitutes an "inconsistent," pretextual explanation. *Id.* at 22-23

The Court finds his argument unavailing and insufficient to create a genuine dispute of material fact. Even if the Court accepted that only the Lab Manager could serve as the Pharmacist-in-Charge, which is doubtful, Anderson effectively satisfied that condition when he named Brady as the replacement. Brady held the title of associate clinical director, and her responsibilities included supervising all registered pharmacists and the College of Pharmacy's Monroe facility, including its mock pharmacy. Walker's Dep. 133-135. Brady also served as Walker's direct supervisor at the time of his demotion from Lab Manager. Walker's Dep. 133. Until ULM hired

another Lab Manager, Brady functioned as the closest equivalent because she had supervisory authority over Walker, the mock pharmacy, and all registered pharmacists. Under these circumstances, Anderson's decision to replace Walker with Brady as the Pharmacist-in-Charge was an objectively reasonable, non-pretextual, action, and therefore, Anderson is entitled to qualified immunity.

## Conclusion

For the foregoing reasons, the Court grants summary judgment and dismisses Walker's remaining claims with prejudice.

**DONE AND SIGNED** at Shreveport, Louisiana, this 6th day of May, 2026.

_____
ALEXANDER C. VAN HOOK
UNITED STATES DISTRICT JUDGE